**Below is an Order of the Court.**

_Randall L. Dunn_
RANDALL L. DUNN
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In Re: ) | Bankruptcy Case |
| ) | No. 05-30611-rld13 |
| Jeffrey C. Lindquist, ) | |
| ) | |
| Debtor. ) | MEMORANDUM OPINION |

    Ms. Eleanor Lindquist's ("Ms. Lindquist") Motion to Dismiss Dr. Jeffrey C. Lindquist's ("Dr. Lindquist") Chapter 13 Case (the "Motion to Dismiss") and her Motion for Contempt of Court (the "Contempt Motion") against Dr. Lindquist were heard on Friday, August 18, 2006 (the "Hearing"). The Motion to Dismiss and the Contempt Motion collectively are referred to herein as the "Motions." Following the Hearing, I have reviewed the transcript of the Hearing, my notes, the admitted exhibits and the parties' other submissions[1], and such pleadings and other

---

[1] At the conclusion of the Hearing, I stated: "The record, of course, is closed. I will not entertain any further submissions with regard to this particular matter." Transcript of August 18, 2006 Hearing, at p. 191. I, therefore, neither reviewed nor considered in my preparation of this Memorandum Opinion the "Post-Trial Memorandum Re: Creditor Eleanor Lindquist's Motion to Dismiss Chapter 13 Bankruptcy
(continued...)

Page 1 - MEMORANDUM OPINION

documents on the docket as I have determined to be relevant. In addition, I have reviewed the authorities cited by the parties and other relevant authorities that I have found through further research. I have considered carefully the oral testimony and arguments presented at the Hearing, as supported by the admitted exhibits. The following findings of fact and conclusions of law constitute the court's findings under Federal Rule of Civil Procedure 52(a), applicable with regard to the contested matters presented at the Hearing under Federal Rule of Bankruptcy Procedure 9014.

## Factual and Procedural Background

The apparent precipitating cause behind the filing of the Motions by Ms. Lindquist is that Dr. Lindquist lost his job with Intel Corporation ("Intel") on or about November 10, 2005, shortly after his chapter 13 plan was confirmed by order of this court entered on October 27, 2005. While Dr. Lindquist was employed by Intel, his gross compensation was approximately $7,333 per month, plus a bonus of approximately $1,000.00 per month. See Ex. Wa, p.1, and Ex. Wb, p.1. Following termination of his employment with Intel, Dr. Lindquist's compensation was reduced to unemployment compensation of $1,440 per month. See Ex. 2.

In his original Schedule J, Dr. Lindquist included as an expense a payment of support to Ms. Lindquist in the amount of $1,375 per month, characterized as "currently in negotiation." See Ex. Wa, p.2. In

---

[1](...continued)
Pursuant to Title 11 U.S.C. § 1307(c)(6)(7)(8) and Title 11 U.S.C. § 1330(a)," filed August 23, 2006, by Dr. Lindquist.

Page 2 - MEMORANDUM OPINION

his amended Schedule J, the same amount of support for Ms. Lindquist is included, but the "currently in negotiation" characterization is eliminated.  See Ex. Wb, p.2.  Apparently, medical insurance coverage was provided both for Dr. Lindquist and Ms. Lindquist through Dr. Lindquist's employment with Intel.

When Dr. Lindquist's employment with Intel terminated, he ceased making support payments to Ms. Lindquist, and, although the record is ambiguous on this point, there may have been discontinuous medical insurance coverage for Ms. Lindquist until Dr. Lindquist made arrangements for COBRA coverage.

Ms. Lindquist filed her Motion to Dismiss on December 28, 2005, based primarily on Dr. Lindquist's alleged failures to make the monthly expense payments for her benefit, as specified in Dr. Lindquist's Schedule J filed with the court.  Ms. Lindquist filed her Motion for Contempt on January 9, 2006.  The Motion for Contempt was based on Ms. Lindquist's allegations that Dr. Lindquist was not making support and medical insurance payments on her behalf, as stipulated to by Dr. Lindquist's counsel in court.  In addition, Ms. Lindquist alleged that Dr. Lindquist had violated his obligations under the order confirming his chapter 13 plan (the "Confirmation Order") by entering into new credit arrangements without obtaining the prior permission of the chapter 13 trustee (the "Trustee").  She also complained that "Dr. Lindquist has informed me that he has asked the Trustee for permission to exercise his Intel Stock Options when they are subject to a Family Law Joinder Action and as such 50% of the proceeds are the property of creditor Eleanor Lindquist...."

Page 3 - MEMORANDUM OPINION

Following a scheduling hearing on February 13, 2006, a Scheduling Order was entered (Docket No. 273) setting a final evidentiary hearing on the Motions for March 24, 2006, at 9:00 a.m., with exhibits and other submissions due to be filed by March 17, 2006.

On March 21, 2006, Dr. Lindquist filed a motion requesting a setover of the final evidentiary hearing based upon Ms. Lindquist having filed a Bar Complaint against Dr. Lindquist's counsel, Ann Chapman, and listing Ms. Chapman as one of her witnesses at the evidentiary hearing. At the scheduled time for the evidentiary hearing, the court dealt with a number of procedural matters, including affirming the court's decision to grant the requested setover and requiring that Ms. Lindquist appear personally at the evidentiary hearing. The evidentiary hearing on the Motions was rescheduled for May 1, 2005, at 9:00 a.m. See Docket No. 325.

After further procedural maneuvering, an additional scheduling hearing took place on May 17, 2006, at 2:00 p.m., at which time, the court closed discovery on the Motions; held that any documents not produced to date by Ms. Lindquist as to her "hidden assets" allegations would not be admissible at the final evidentiary hearing on the Motions; extended the submissions deadline to June 23, 2006; set a final prehearing conference for July 17, 2006, at 2:00 p.m.; and rescheduled the final evidentiary hearing for July 19, 2006, at 9:00 a.m. See Docket Nos. 369, 370 and 377.

On June 9, 2006, Ms. Lindquist filed a motion to amend her Motion to Dismiss (the "Motion to Amend"), requesting an expedited hearing. See Docket No. 392. By letter dated June 20, 2006, the court

Page 4 - MEMORANDUM OPINION

advised the parties that the court considered all matters raised in the Motion to Amend as already encompassed within the Motions, except for Ms. Lindquist's requests for an accounting and disgorgement of funds from Dr. Lindquist's domestic relations counsel in California, which matters would be addressed, if necessary, after the final evidentiary hearing on the Motions. See Docket No. 393.

At a telephone hearing on July 21, 2006, the final evidentiary hearing on the Motions was rescheduled to August 18, 2006, at 9:00 a.m., in light of medical/health issues raised by Ms. Lindquist. See Docket No. 426. Testimony and argument were presented at the Hearing on August 18, 2006, and the court took the Motions under advisement.

## Legal Discussion

Since the issues raised under each of the Motions are distinct, I will consider each of the Motions in turn, and I start with consideration of the Motion for Contempt.

A. <u>Motion for Contempt</u>. "Contempt of court" has been generally characterized in <u>Black's Law Dictionary</u> (4th ed. rev. 1968) as "[c]ommitted by a person who does any act in willful contravention of [the court's] authority or dignity, or tending to impede or frustrate the administration of justice, or by one who, being under the court's authority as a party to a proceeding therein, willfully disobeys its lawful orders or fails to comply with an undertaking which he has given."

The first two bases asserted by Ms. Lindquist for granting her Motion for Contempt against Dr. Lindquist are his alleged violations of stipulations by his counsel before the court that he would make spousal support and medical insurance payments for her benefit. The alleged

Page 5 - MEMORANDUM OPINION

"stipulations" were made during the course of the following colloquy among the court, counsel for Dr. Lindquist and Ms. Lindquist during the course of a hearing on Ms. Lindquist's motion for relief from stay held on May 18, 2005:

> THE COURT: All right. And what the plan does is, after that analysis of the income and expenses, provides that the disposable income that the debtor has left after paying his normal living expenses is committed for a minimum period of three years to paying his creditor claims.
> Now, in addition, this is a special case in that he has agreed that as part of his payments he's going to pay your medical insurance. And you're right in your pleadings, I believe my analysis of the plan--Ms. Chapman will correct me if I'm wrong--in effect you are the largest creditor, and each month you're going to get the bulk of the money because the balance of the money under the plan as drafted would pay administrative expenses of the Chapter 13 and his priority tax debt. The only unsecured creditor who would get anything is you. So the real question is the amount.
> And, Ms. Chapman, am I wrong? Have I read the plan wrong?
> MS. CHAPMAN: I think you have it, Your Honor. I mean, he's ably employed 10 of the last 12 years at Intel as a senior engineer, making nearly $90,000 a year. That's all verified by pay stubs that have been provided to the trustee. My client is current on his plan payments.
> And it's unfortunate that we can't find a way to pay Ms. Lindquist any additional funds, but she is entitled to the support that we've agreed to, and I don't believe that there's any dissolution court that can find that there's any other feasible way for him to pay more....

Transcript of May 18, 2005 Hearing, Ex. B to Dr. Lindquist's Response (the "Contempt Response") to the Motion for Contempt, Docket No. 233, at pp. 15-16.

The foregoing colloquy was an attempt by the court and Dr. Lindquist's counsel to explain to Ms. Lindquist, appearing pro se, how

Page 6 - MEMORANDUM OPINION

Dr. Lindquist's chapter 13 plan would operate, at a relatively early stage in this chapter 13 case. I agree with Dr. Lindquist's counsel that the subject statements do not constitute a "binding agreement of support from which no deviation can occur, regardless of a change in circumstances." Contempt Response, at p. 3. Even Ms. Lindquist admitted earlier at the May 18, 2005 hearing that, "There has never been a stipulation of any support for me." Transcript of May 18, 2005 Hearing, Ex. B to the Contempt Response, at p. 7.

Dr. Lindquist stopped making support payments to Ms. Lindquist after he lost his job at Intel in the fall of 2005. The record reflects that he is making COBRA payments to provide health insurance for the benefit of Ms. Lindquist, as required by the order of the San Mateo County, California Superior Court (the "Superior Court") filed on March 1, 2006. See Ex. 3, at p. 2. Dr. Lindquist is not making the $1,375 per month support payments to Ms. Lindquist, as projected in his original and amended Schedule J filed in this case, and that is highly unfortunate, both for him and for Ms. Lindquist. But he violated no court order or stipulation in ceasing to make such payments when he lost his job and thus lost the income from which to make such payments. Inclusion of the proposed support payment in the original and amended Schedule J does not constitute an order that Dr. Lindquist make the payment, even in light of the order confirming Dr. Lindquist's chapter 13 plan (the "Confirmation Order").

Ms. Lindquist next asserts that Dr. Lindquist violated the Confirmation Order by entering into debt obligations postconfirmation without the Trustee's permission. Specifically, Ms. Lindquist points to

Page 7 - MEMORANDUM OPINION

Dr. Lindquist's medical insurance costs having risen to $866.66 a month since his employment with Intel terminated, and Dr. Lindquist having employed attorney Ian Yourtz to represent his interests in the continuing California marital dissolution case with Ms. Lindquist.

The first sentence of paragraph 2 of the Confirmation Order states that, "The debtor shall incur no credit obligations during the life of the plan without the trustee's written consent unless made necessary by emergency or incurred in the ordinary course of operating the debtor's business." Docket No. 167, at p. 1.

When Dr. Lindquist lost his job with Intel, he also lost coverage for himself and Ms. Lindquist under Intel's employee health insurance plan. He obtained COBRA coverage for himself and Ms. Lindquist so that both of them would have continuing health insurance coverage. The Superior Court has ordered Dr. Lindquist to maintain health insurance coverage for the benefit of Ms. Lindquist. See Ex. 3, at p. 2. Ms. Lindquist testified that she preferred that Dr. Lindquist "pay for my medical coverage, yes." Transcript of August 18, 2006 Hearing, at p. 136. The Trustee had no objection to Dr. Lindquist paying for COBRA medical insurance. See Ex. E.

There is no provision of the Bankruptcy Code[2] that requires a postconfirmation chapter 13 debtor to obtain court permission prior to hiring legal counsel to represent the debtor with regard to legal matters

---

[2] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036, as enacted and promulgated prior to the effective date (October 17, 2005) of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, April 20, 2005, 119 Stat. 23.

Page 8 - MEMORANDUM OPINION

independent of the continuing chapter 13 case.[3]  Counsel for Dr. Lindquist disclosed to the Trustee that Dr. Lindquist was retaining domestic relations counsel, with a $2,500 retainer and legal costs expected to climb from there, to represent Dr. Lindquist in the California divorce proceeding with Ms. Lindquist, and the Trustee did not object to that arrangement.  See Ex. E.  In her argument at the Hearing, Ms. Lindquist stated that she thought Dr. Lindquist should have a lawyer in the continuing Superior Court marital dissolution proceeding.  See Transcript of August 18, 2006 Hearing, at p. 179.

Finally, Ms. Lindquist complains about Dr. Lindquist's request to the Trustee that he be allowed to exercise some of his Intel stock options "when they are subject to a Family Law Joinder Action."  Issues with respect to Dr. Lindquist's exercise of Intel stock options were aired before the court at a hearing, at which Ms. Lindquist participated by telephone, on January 17, 2006.  The court subsequently entered an order (the "Stock Option Order") on January 20, 2006, dealing with Intel stock option issues as follows:

> This matter comes before the Court on Debtor's Motion for Authority to Exercise Stock Option and Sell Intel Stock *Nunc Pro Tunc* and Disburse Portion of Proceeds ("Motion") filed with the Bankruptcy Court on January 18, 2006.  Trustee, Brian D. Lynch, consented to the

---

[3] Section 329(a) of the Bankruptcy Code provides that, "[a]ny attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, <u>for services rendered or to be rendered in contemplation of or in connection with the case by such attorney</u>, and the source of such compensation."  [Emphasis added.]

Page 9 - MEMORANDUM OPINION

> exercise of the Intel stock options prior to their exercise. Creditor, Eleanor Lindquist indicated she had no objection to the exercise of the stock options in open court on January 17, 2006. Based upon the foregoing and finding just cause, now therefore; IT IS HEREBY ORDERED that the debtor is authorized *nunc pro tunc* to exercise his Intel stock options. IT IS FURTHER ORDERED that from the proceeds, Jeffrey Lindquist shall be permitted to retain $1,500 of the proceeds and that Creditor, Eleanor Lindquist, will be paid $1,500 from the proceeds. The remaining sale proceeds shall be held pending further order of this Court.

See Ex. G. The Stock Option Order was not appealed.

The court entered an additional consent order (the "Consent Order") on February 9, 2006, providing for a further distribution of funds on deposit in the "UBS Account" equally to Ms. Lindquist and Dr. Lindquist, provided that if "the Balance is not equally divisible, the extra penny shall be distributed to Eleanor Lindquist." See Ex. J. The Consent Order further provided that, "[t]he Distribution is conditioned on and subject to the full reservation of rights made by the parties on the record of the hearing regarding reallocation of the Balance either in the California state court domestic relations proceeding or by written agreement of the parties." Id.

With respect to any remaining Intel stock options, their exercise and the allocation of any proceeds with respect to such exercise are under the jurisdiction of the Superior Court, as provided in Orders of the Ninth Circuit. See Ex. H and Docket Nos. 260 and 381.

Based on the foregoing discussion of the Motion for Contempt and the related record at the Hearing, the court finds that Dr. Lindquist has not acted in willful contravention of the authority of this court or in violation of any order or stipulation before this court. Accordingly,

Page 10 - MEMORANDUM OPINION

the court finds that an award of contempt of court sanctions against Dr. Lindquist is not appropriate, and the court will deny Ms. Lindquist's Contempt Motion.

B. <u>Motion to Dismiss</u>. After considering the parties' arguments in their written submissions and as presented at the Hearing, the court is considering the Motion to Dismiss as brought pursuant to Section 1307(c), for "cause." Section 1307(c) provides in pertinent part:

> [O]n request of a party in interest or the United States trustee and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause, including....

There are a number of specific "causes" included in Section 1307(c) that are not relevant to Ms. Lindquist's Motion to Dismiss, but the term "cause" in Section 1307(c) is not exclusive. See <u>Valenti v. Valenti (In re Valenti)</u>, 310 B.R. 138, 151 (9th Cir. BAP 2004), citing <u>Leavitt v. Soto (In re Leavitt)</u>, 171 F.3d 1219, 1224 (9th Cir. 1999). The court is prepared to consider all of Ms. Lindquist's evidence and arguments in deciding the Motion to Dismiss.

Ms. Lindquist argues that Dr. Lindquist's chapter 13 case should be dismissed, based on alleged inaccuracies in his schedules filed with the court and alleged "hidden assets" that have not been revealed, either to date or in a timely fashion. These are not new allegations from Ms. Lindquist. In fact, at the adjourned confirmation hearing on October 27, 2005, at which the court confirmed Dr. Lindquist's chapter 13 plan, Ms. Lindquist asserted that there were creditors and assets not

Page 11 - MEMORANDUM OPINION

listed in Dr. Lindquist's schedules, but she did not provide any evidence at that time. Now, approximately ten months later, Ms. Lindquist had the opportunity in the all-day Hearing to present her evidence as to alleged hidden assets and inaccurate schedules. Beyond her continuing general allegations, she presented the following:

    1. Ms. Lindquist asserted that while Dr. Lindquist was employed at Intel, he received bonuses of approximately $1,000 a month that were not disclosed on his Schedule I. Ms. Chapman testified that the "trustee was notified of the bonuses when he was provided pay stubs." Transcript of August 18, 2006 Hearing, at p. 59. In addition, Ms. Chapman testified that Dr. Lindquist projected bonuses of $1,000 a month in his original I and J Schedules and included the projected bonus amount on the "estimated monthly overtime" line in the Schedule I because that was where the software allowed it to be entered. See Transcript of August 18, 2006 Hearing, at pp. 59 and 76; Ex. Wa, at p. 1; and Ex. Wb, at p. 1.

    2. Ms. Lindquist asserted that Dr. Lindquist incorrectly listed funds in his Wells Fargo checking account on the date that he filed his chapter 13 bankruptcy petition as only $100 in his Schedule B, when he "consistently had over [$]2,000 up to $7,000 in his bank account." Transcript of August 18, 2006 Hearing, at p. 63. In her direct testimony, Ms. Lindquist amended her statement to allege that Dr. Lindquist had "over [$]6,000 to $9,000" in his Wells Fargo bank account. Transcript of August 18, 2006 Hearing, at p. 92. Ms. Lindquist did not submit any of Dr. Lindquist's Wells Fargo bank account statements as exhibits at the Hearing, and she did not point to any particular bank

Page 12 - MEMORANDUM OPINION

statement as tending to establish that Dr. Lindquist in fact did not have $100 in his Wells Fargo bank account on January 21, 2005, the date he filed his chapter 13 bankruptcy petition. The court notes that with monthly compensation from Intel of $7,333, plus projected bonuses of $1,000 a month, it would not be a surprise to find that Dr. Lindquist's bank statements periodically would show amounts on deposit ranging from $2,000 to $7,000 or higher, subject to outstanding checks.

3. Ms. Lindquist established that Dr. Lindquist did not list amounts in his Charles Schwab and American Funds accounts on his Schedule B when he filed his original Schedules. See Docket No. 29, Schedule B. Ms. Chapman testified that she first became aware of the Charles Schwab account in July 2005 from an e-mail from Dr. Lindquist. Transcript of August 18, 2006 Hearing, at p. 7. At that time, pursuant to normal office procedures, Ms. Chapman had one of her paralegals contact Dr. Lindquist to obtain documentation, that was not forthcoming. Id. at pp. 7-8. She further testified that she did not become aware of the American Funds account until February, 2006. Id. at p. 7.

Dr. Lindquist's Schedule B was amended to include the Charles Schwab and American Funds accounts on March 2, 2006. See Ex. K and Docket No. 285. On the same date, Dr. Lindquist's counsel advised the Trustee by letter and by e-mail of the existence of the accounts. See Exs. L and M. Dr. Lindquist's chapter 13 plan subsequently was amended to include the combined amounts of the Charles Schwab and American Funds accounts in the "best interest" number, the minimum amount that must be paid to general and priority unsecured creditors under a chapter 13 plan. See Section 1325(a)(4). Because Dr. Lindquist's priority tax obligations

Page 13 - MEMORANDUM OPINION

are higher than the amended "best interest" number, the amendment to the plan to include the combined amounts of the Charles Schwab and American Funds accounts did not change the projected number or amounts of Dr. Lindquist's chapter 13 plan payments. Transcript of August 18, 2006 Hearing, at pp. 74-75. Ms. Chapman testified that she regretted the delay in advising the Trustee about the subject accounts. Transcript of August 18, 2006 Hearing, at p. 37. In argument, counsel for the Trustee advised the court that he did not consider the delay in disclosing the Charles Schwab and American Funds accounts as unreasonable in the context of this case. Transcript of August 18, 2006 Hearing, at pp. 165-166.

    4. Ms. Lindquist asserted that Dr. Lindquist had not disclosed his equity interest in a business entity called "Osteobiologics." She brought some documents relating to this alleged equity interest with her to the Hearing, but the court refused to admit them, and the court did not review them, because they had not been provided in discovery to either counsel for Dr. Lindquist or the Trustee.

    The court previously had ordered that documents in support of Ms. Lindquist's "hidden assets" allegations would not be admissible at the Hearing if they had not been produced during the course of discovery. See Docket Nos. 369, 370 and 377. Ms. Lindquist testified in direct examination that she had "a folder full of Osteobiologics which I have told Jeffrey about [a] long time ago and brought up in this court...." Transcript of August 18, 2006 Hearing, at p. 87. Yet, none of those documents were produced until the court required their production to counsel for Dr. Lindquist and the Trustee at the Hearing.

    Ms. Lindquist testified and stated in argument that she

Page 14 - MEMORANDUM OPINION

recently had received a check relating to Osteobiologics. Transcript of August 18, 2006 Hearing, at pp. 87, 88, 169-70. She did not testify as to the amount of the check. In argument, Ms. Lindquist further stated that she used "my power of attorney to cash the check"--a power of attorney that Dr. Lindquist had cancelled early on in this case. Transcript of August 18, 2006 Hearing, at pp. 118, 169. Ms. Lindquist's admission as to her use of the power of attorney to cash a check came after her testimony under oath on cross-examination that, "I don't use the power of attorney." Transcript of August 18, 2006 Hearing, at p. 119.

\*\*\*

Divested of Ms. Lindquist's generalized claims about the existence of "hidden assets" and failures to disclose in Dr. Lindquist's schedules that will be revealed at some point in the future (Transcript of August 18, 2006 Hearing, at p. 94), the foregoing summarizes the evidence submitted by Ms. Lindquist at the Hearing in support of her Motion to Dismiss. After hearing the presentation of evidence, counsel for the Trustee stated in argument that, "I'm still searching for cause to dismiss this case" (Transcript of August 18, 2006 Hearing, at p. 165). I agree.

At this point, Dr. Lindquist's chapter 13 case is approximately 20 months old. Ms. Lindquist was given a substantial opportunity over a number of months to gather and present evidence in support of her Motion to Dismiss. In fact, she testified that she has been working with a company called Northwest Fraud Investigation Associations to track down Dr. Lindquist's "hidden assets," and apparently, she has opened and

Page 15 - MEMORANDUM OPINION

reviewed Dr. Lindquist's mail that has been delivered to her residence address. See Transcript of August 18, 2006 Hearing, at pp. 88, 126-27.

Ms. Lindquist did press the revelation of the Charles Schwab and American Funds accounts, resulting in an amendment to Dr. Lindquist's Schedule B and an amendment to the "best interest" number in Dr. Lindquist's chapter 13 plan. However, those amendments resulted in no change to the payments that creditors will receive under Dr. Lindquist's chapter 13 plan, and Ms. Lindquist did not present any evidence of "hidden assets" at the Hearing beyond what has been discussed in this Memorandum Opinion. As stated by Chief Justice Burger in his dissenting opinion in Wallace v. Jaffree, 472 U.S. 38, 90 (1984)(quoting a proverb from Horace, Epistles, bk. III (Ars Poetica), line 139), "The mountains have labored and brought forth a mouse."

Based on the record of the Hearing, including all admitted exhibits, the court finds that Ms. Lindquist has not met her burden of proof to establish cause for dismissal of Dr. Lindquist's chapter 13 case, and the court will deny the Motion to Dismiss.

### Limitation of Further Proceedings

In light of the opportunities presented to Ms. Lindquist to marshal and present evidence in support of her hidden assets allegations against Dr. Lindquist at the Hearing and in prior proceedings before this court, and being mindful of the time and expense to the parties of engaging in disputes regarding such matters, in future, the court will require that Ms. Lindquist pursue such allegations through presentation of any evidence she gathers to the Trustee for such further proceedings as the Trustee determines to be appropriate. As was discussed at the

Page 16 - MEMORANDUM OPINION

Hearing, Ms. Lindquist has had multiple bites at this particular apple, and the court will not give her any more, based on motions that she brings on her own. Accordingly, if Ms. Lindquist brings any further motion(s) to dismiss Dr. Lindquist's chapter 13 case based upon allegations of "hidden assets" or inaccurate schedules, the court will deny any such motions, with prejudice, without need for any response from Dr. Lindquist.

In light of the foregoing findings and conclusions on the Contempt Motion with respect to Dr. Lindquist's retention of attorney Ian Yourtz as his counsel in the marital dissolution proceeding pending before the Superior Court, the court will take no action on Ms. Lindquist's motion for an accounting and return of funds by Mr. Yourtz. See Docket No. 382.

## Conclusion

Based on the foregoing review of the evidence presented at the Hearing and applicable legal authorities, Ms. Lindquist's Motion to Dismiss and Contempt Motion will be denied. Mr. Vanden Bos should submit an appropriate form of order consistent with this Memorandum Opinion within the next ten days.

###

cc: Robert J. Vanden Bos
Eleanor Lindquist
Brian D. Lynch, Trustee